**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**NORTHERN DIVISION**

JENNIFER DANIELS,

        Plaintiff,                    Case No.

v.                                Hon.

CENTRAL MICHIGAN UNIVERSITY BOARD
OF TRUSTEES, TRACY GALAROWICZ, in her
individual and official capacities, and JENNIFER
SCHISA, in her individual and official capacities,

        Defendants.
_____

FABIOLA A. GALGUERA (P84212)
NACHTLAW, P.C.
*Attorneys for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, Michigan 48108
(734) 663-7550
fgalguera@nachtlaw.com
_____

### **PLAINTIFF'S FIRST COMPLAINT AND JURY DEMAND**

NOW COMES Plaintiff Jennifer Daniels (hereinafter "Ms. Daniels" or "Plaintiff"), by and through undersigned counsel NACHTLAW, P.C. and hereby respectfully submits the following:

### **INTRODUCTION**

Plaintiff, Jennifer Daniels, hereby brings an action for monetary damages, attorneys' fees, costs, and injunctive relief pursuant to 42 U.S.C. § 1983, Title VI of

1

the Civil Rights Act, Michigan's Elliott-Larsen Civil Rights Act, Breach of Contract, Intentional Infliction of Emotional Distress, and Gross Negligence against Central Michigan University Board of Trustees, Tracy Galarowicz, and Jennifer Schisa.

## PARTIES, VENUE, AND JURISDICTION

1.     Plaintiff Jennifer Daniels (hereinafter referred to as "Plaintiff"), has been a PhD student at Central Michigan University (hereinafter referred to as "CMU") since 2017.

2.     Defendant Central Michigan University Board of Trustees (hereinafter referred to as "CMU" or "CMU Board of Trustees") is an eight-member Board elected by Michigan voters, which is responsible for selecting CMU presidents, supervising the control and direction of university funds, setting tuition and other fiscal policies, determining compensation for services, and conferring degrees at CMU, a public university located in Mount Pleasant, Michigan.

3.     Defendant Tracy Galarowicz is alleged to have served as Interim Dean of the College of Science and Engineering and to have taken actions described below, and is sued in her individual and official capacities.

4.     Defendant Jennifer Schisa is alleged to have served as Interim Director of Graduate Studies, as such oversaw and is responsible for the processes Plaintiff was subjected to, and is sued in her individual and official capacities.

2

5. The events underlying this Complaint occurred in Mount Pleasant, Michigan, within the Eastern District of Michigan.

6. This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

## FACTUAL ALLEGATIONS

7. Before attending CMU, Plaintiff received a bachelor's degree with a double major in Mathematics and Physics from Bryn Mawr College and a Master of Science in Applied Mathematics and another Master of Science in Statistics from Western Michigan University.

8. After Plaintiff joined the CMU Mathematics Department for her PhD, a new Department was created in 2019: the Statistics, Actuarial, and Data Science (hereinafter referred to as "STAD") Department.

9. Plaintiff's PhD then fell under the newly created STAD Department.

10. Plaintiff's husband is a professor in this Department.

11. Plaintiff is one of the few women PhD candidates in the Department as well as one of the few American-born students, with tribal connections.

### Grade appeal and early complaints

12. Plaintiff's time in the Department has been marked by conflict and disparate treatment.

13.     Starting in 2018, Plaintiff began speaking up against unfair practices occurring in the department.

14.     After STAD professor Kahadawala Cooray "dared students" to complain about his unfair practices in STA 584, Plaintiff did step up to seek justice for her class. What has followed since then has been a pattern of disparate treatment.

15.     Plaintiff filed a grade appeal in the spring semester of 2019 with the Mathematics Department Chair on January 14, 2019 for the STA 584 course previously taught by Dr. Cooray.

16.     During a joint meeting with the Math Chair on March 25, 2019, Plaintiff pointed out Dr. Cooray's habitual lateness to STA 584.

17.     Plaintiff also discussed the numerous unfair and inequitable changes he made to his syllabus, his repeated errors and/or inaccuracies in calculating scores, and his reliance on an actuary exam manual to write quizzes for a non-actuary course.

18.     Finally, Plaintiff discussed Dr. Cooray's attitude towards and continued beratement of students.

19.     This meeting resulted in humiliation and yelling from Dr. Cooray, who stated he could not believe she had failed his "baby quiz" Dr. Cooray called Plaintiff a "liar" three times during the meeting and stormed out.

20.    It is with this backdrop that Plaintiff had to continue taking courses with Dr. Cooray; the Department was extremely limited on faculty.

### Qualifying exams, appeals and program removal (2019)

21.    In the spring of 2019, STA 684 was marred with similar issues Plaintiff had already reported about: abuse of students and a failure to respond to student questions.

22.    Plaintiff was not even finish the course materials yet she continued to be outspoken against the unfair treatment.

23.    Plaintiff received notification that she failed a STAD theoretical statistics qualifying exam in August of 2019; while Plaintiff was prepared for the exam, none other than Dr. Cooray was writing a part of the exam as well as being part of the committee grading it.

24.    These qualifying exams are essential, as they are required to be able to defend a PhD dissertation.

25.    When Plaintiff sought to review her exam scores, she discovered that she had not been accurately told scores, there were *zero written documentation* as to how those scores were assigned, and that there was a great disparity in the scores.

26.    Plaintiff appealed this exam decision.

27.    Dr. Cooray was also on the department Graduate Committee that denied the appeal.

**Retakes/program removal**

28.     Plaintiff had to re-take the theoretical qualifier exam in January 2020, again, Dr. Cooray was writing and scoring the exam along with Dr. Felix Famoye, the Graduate Committee Chair and one of the professors that participated in the previous exam and whom Plaintiff filed an appeal against.

29.     Once again, Plaintiff was failed.

30.     Plaintiff was approached by the only female member of the exam committee, who indicated that, based on her evaluation, Plaintiff had actually passed the exam.

31.     Critically, she mentioned to Plaintiff that she felt it was wrong for Drs. Cooray and Famoye to have been part of the exam writing and/or grading given Plaintiff's grievances.

32.     After this unfairly administered qualifier and the subsequent filing of a new complaint for a FERPA violation, Plaintiff felt she had no choice but to get CMU involved.

33.     After the third failed qualifying exam in August 2020, Dr. Famoye kicked Plaintiff out of the PhD Program.

34.     In October of 2020, Plaintiff reached out to the Provost's Office to report "a systematic pattern of bias and ineptness within the CMU STAD Department."

6

35. Plaintiff followed up with an email to CMU's Office of Civil Rights and Institutional Equity in order to "submit a grievance involving a conflict of interest, impartiality issues, and gender bias" against the STAD Department.

36. CMU produced a self-serving decision that indicated there was no evidence of gender bias. At this point, Plaintiff had to simply wait until she could re-matriculate at CMU to finish her PhD, which in it of itself was a process because none other than the same faculty she had been consistently reporting were trying to block her return to the STAD department, forcing her to wait a 12-month period.

37. Plaintiff had to appeal to the Interim Director of Graduate Studies, which was denied.

### Reinstatement process

38. Plaintiff had to wait until February of 2022 to apply for reinstatement.

39. Plaintiff was readmitted after her reinstatement application; notably Dr. Cooray was recused from ranking her application, though she was denied a GA position by Dr. Famoye.

40. Dr. Famoye would not reveal how Plaintiff's application ranked compared to others, but Plaintiff was notified in August of 2022 by another faculty that using the qualitative analysis the University faculty *is supposed to use*, her application would have actually ranked *first*.

41.     Dr. Mohamed Amezziane felt that Plaintiff's denial was "complete nonsense" and encouraged Plaintiff to report disparate treatment.

**Continued Exam Issues**

42.     On September 15, 2022, after attempting another qualifying exam, Plaintiff was notified by Dr. Cooray that she had yet again failed another qualifier.

43.     Dr. Amezziane referenced above shared with Plaintiff that Dr. Cooray had explicitly refused setting the qualifying exam passing score at 65, which had been used as the passing score on previous exams.

44.     This faculty would later go on record indicating that he felt this exam evaluation was unfairly done as he was purposely excluded from a hastily convened Graduate Committee meeting and was unable to advocate for Plaintiff.

45.     Dr. Amezziane has since been punished for continuing to advocate for Plaintiff.

46.     The years that followed were marked by repeated harassment and unfair treatment by the STAD department.

47.     Plaintiff continued to stand up for herself and filed a Complaint with the U.S. Department of Education Office for Civil Rights Discrimination in 2023 alleging gender and national origin bias.

48. By the end of 2023, through the use and work of counsel serving as an advisor, there was a short period of tense peace, where Plaintiff was able to continue with her studies *more or less* uninterrupted.

49. Plaintiff sat and passed her final qualifier exam officially on September 12, 2024. The findings were approved and acknowledged by the STAD Exam Committee and the STAD Graduate Committee.

50. After finally receiving the acknowledgment she deserved, Plaintiff pushed on to get her PhD finalized.

### Dissertation Issue

51. On January 16, 2025, Plaintiff received approval for her dissertation prospectus.

52. On April 7, 2025, Plaintiff's flyer announcing her dissertation defense on April 14, 2025 was disseminated across campus.

53. On April 8, 2025 Defendants Galarowicz, Interim Dean of the College of Science and Engineering and Schisa, Interim Director of Graduate Studies notified Plaintiff that her dissertation committee "was incorrect."

54. CMU requires two faculty members in the student's area of research interest for a dissertation committee, but the STAD Department allegedly required two faculty from the Department specifically.

55.	Plaintiff was not able to locate this policy on the Graduate Studies website.

56.	Plaintiff was told to simply wait until her advisor returned from his leave to sort the matter out.

57.	This left Plaintiff stripped of her opportunity to defend on April 14, 2025.

58.	The next communication Plaintiff has from Defendants came from Defendant Galarowicz who sent a letter on May 14, 2025.

59.	The letter stated that *now* she was rescinding the pass Plaintiff had received on the qualifying exam and was referring Plaintiff to the Office of Student Conduct for Academic Misconduct.

60.	Without even bringing an allegation to Plaintiff's decision, Defendant Galarowicz determined that Plaintiff committed academic dishonesty during the passed 2024 qualifying exam.

61.	Defendant Galarowicz was not Plaintiff's professor, was not on any of the exam committees, did not proctor the exam, or even have her role as Interim Dean until March 2025.

62.	Defendant Galarowicz was definitely aware of Plaintiff's past complaints against the Department as she had served as an Associate Dean in the College.

63.     Plaintiff was not allowed to discuss the finding or provide evidence *before* the decision was made.

64.     Plaintiff was given an opportunity to appeal, during which Defendant Galarowicz summarily indicated that she made her decision based on her conversation regarding two other faculties about concerns against them, one of whom happened to be Plaintiff's husband.

65.     Plaintiff was given no details nor proof about how that matter proved that she engaged in academic dishonesty.

66.     It was clear that the decision made on May 14, 2025, regardless of what Plaintiff said, was final.

67.     Plaintiff's appeal was arbitrarily denied.

68.     As Defendant Galarowicz noted on May 30, 2025, the **Dean's** decision on appeal would be final.

69.     Plaintiff had a passing score from an exam overturned nearly eight months after the exam without any process.

70.     The decision that Plaintiff committed academic dishonesty was made before she was even notified.

71.     Plaintiff was sanctioned before she was even notified.

72.     Plaintiff was not allowed to review or respond to the evidence against her.

73. Defendants, fully aware of Plaintiff's repeated struggles with her Department, picked one of the most *painful* moments they could have to retaliate against Plaintiff for her repeated engagement in protected activity.

74. When Plaintiff should have been celebrating a one-month anniversary of having defended her PhD, she was told that her PhD was being taken from her yet again.

75. But for her gender, Plaintiff would have never been treated continuously to a pattern of abuse.

76. But for her gender, Plaintiff would have not engaged in protected activity by filing complaints and opposing discrimination.

77. But for her complaints, she would not have been retaliated against and deprived of due process on May 14, 2025 when Defendants arbitrarily took an exam pass away from Plaintiff.

## Attempted Forced Disenrollment

78. The deprivations, unfortunately, have only continued.

79. Given the very mess created by Defendants as described above – interfering with her exams and improperly invalidating passing scores – Defendant CMU, through its agents, has begun a retaliatory and wholly unfair process to remove Plaintiff from the Program.

80. On April 3, 2026, Professor Jungsywan Sepanski informed Plaintiff via email that given that it was her ninth semester and she was behind on qualifying examinations, she needed to sign up for the exam by April 15, 2026.

81. Plaintiff was thoroughly confused since Professor Sepanski should have been aware of the issues recounted and had passed several qualifiers, warranting a follow-up email with questions.

82. Plaintiff was then instructed to submit an appeal so that she would not be disenrolled by April 27, 2026, threatening dematriculation.

83. When Plaintiff submitted in a timely fashion, Professor Sepanski emailed her, *now* linking to the policy she was working off of, indicating that the appeal was deficient as it was missing a supporting letter from a faculty member.

84. The Department was well aware that Dr. Amezziane, Plaintiff's advisor, was out of office at the time.

85. Plaintiff was given until April 27, 2026, coincidentally due the day before Dr. Amezziane would be re-instated into the faculty.

86. Nonetheless, Plaintiff was able to contact Dr. Amezziane, who indicated he would speak directly to Professor Sepanski as well as getting his signature on her appeal, indicating that he approved the timeline proposed for extension of her time within the program.

13

87.     Despite Dr. Amezziane's clear signature on the documentation, Professor Sepanski unilaterally determined it was not enough while pushing her to answer if she intended on registering for the January 2027 qualifying exam and requiring a new letter in about 24 hours.

88.     After the Graduate Committee met on April 30, 2026, Plaintiff's appeal was approved – contingent on the submission of a letter of support by Dr. Amezziane on May 25, 2026, on Memorial Day.

89.     This deadline was subsequently extended until May 27, 2026.

90.     Plaintiff thought she was back on a path of success when she was informed that, since the Committee meeting, Defendant Galarowicz had met with Dr. Amezziane, and Plaintiff's matter came up.

91.     Upon reasonable belief, during that meeting, Defendant Galarowicz indicated to Dr. Amezziane that he did not "have to" submit a supporting letter for Plaintiff, that he did not have to add to his "stress."

92.     Dr. Amezziane, who had been supporting Plaintiff for the last few *years* and had indicated he would submit this supporting letter, indicated to Plaintiff that he could no longer assist her.

93.     Defendants have gone, and will continue to go, to great lengths to interfere with Plaintiff's education and career.

14

94.     It is likely that missing the May 27, 2026 deadline will lead to de-matriculation.

## COUNT I
### Violation of the Due Process Clause of the
### Fourteenth Amendment to the U.S. Constitution
### Pursuant to 42 U.S.C. § 1983
*(Against the individual defendants for money damages in their personal capacities and declaratory and injunctive relief in their official capacities)*

95.     Plaintiff incorporates the preceding allegations as if fully restated herein.

96.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution provides that "no state shall… deny to any person within its jurisdiction the equal protection of the laws."

97.     Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by persons acting under the color of law.

98.     Defendants acted under the color of state law in taking the actions described *supra*.

99.     A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to discriminate against her based on gender and national origin in a publicly funded educational program as well as purposely interfere with a university process.

100.   Accordingly,                                    Defendants' actions outlined *supra* violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

101.   Plaintiff is entitled to punitive damages because Defendants engaged in the above-described conduct with malicious intent, in callous disregard of Plaintiff's federally protected rights.

102.   Plaintiff has suffered damages and injury and will continue to suffer damages including loss of income and earning capacity, injury to her reputation, emotional distress, and other losses because of Defendants' unlawful acts set forth herein and to be proved at trial.

103.   As a direct and proximate result of Defendants' unlawful actions, Plaintiff has had to retain the services of an attorney and will continue to so suffer in the future.

### COUNT II
**Violation of 42 U.S.C. § 1981**
**Pursuant to 42 U.S.C. § 1983**
*(Against the individual defendants for money damages in their personal capacities and declaratory and injunctive relief in their official capacities)*

104.   Plaintiff incorporates the preceding allegations as if fully restated herein.

105.   Section 1981 provides:

"Equal Rights Under the Law. All persons in the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts to sue, be parties, give evidence, and to the full and equal benefit of all of laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses and exactions of every kind, and to no other."

106.   Under the 14th Amendment, Plaintiff has the guaranteed right to make and enforce contracts free from discrimination.

107.   Section 1981 prohibits intentional discrimination in the making and enforcement of contracts involving both public and private actors.

108.   Section 1983 protects against the "deprivation of any rights, privileges, or immunities secured by the Constitution and laws," including Section 1981, by persons acting under the color of law.

109.   Defendants have discriminated against Plaintiff in violation of Section 1981 and deprived him of his civil right to make and enforce contracts free from racial discrimination by the conduct described herein, including but not limited to dismissing him from CMU.

110.   Defendants acted under the color of state law in taking the actions described *supra*.

111.   A reasonable person or public official should have known that it is a violation of a person's clearly established constitutional rights to discriminate against him on the basis of race and national origin in a publicly funded educational program.

17

112. Accordingly, Defendants' actions outlined *supra* violated Plaintiff's clearly established constitutional rights, of which any reasonable person in their position would have known; Defendants are therefore not entitled to qualified immunity.

113. Plaintiff is entitled to punitive damages because Defendants engaged in the above-described conduct with malicious intent, in callous disregard of Plaintiff's federally protected rights.

114. Plaintiff has suffered damages and injury and will continue to suffer damages including loss of income and earning capacity, injury to his reputation, emotional distress, and other losses because of Defendants' unlawful acts set forth herein and to be proved at trial.

115. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has had to retain the services of an attorney and will continue to so suffer in the future.

## COUNT III
### Violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d
*(Against Defendant the CMU Board of Trustees)*

116. Plaintiff incorporates the preceding allegations as if fully restated herein.

117. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded

18

from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

118.   As a public university, CMU received and continues to receive federal financial assistance.

119.   Defendant the CMU Board of Trustees subjected Plaintiff to intentional discrimination, excluded her from participation in, and denied her the benefits offered by CMU by the actions described herein, including but not limited to falsely failing her on exams, depriving her of due process, and interfering with her ability to graduate.

120.   Plaintiff has suffered damages and injury and will continue to suffer damages including loss of income and earning capacity, injury to her reputation, emotional distress, and other losses because of Defendant the CMU Board of Trustees' unlawful acts set forth herein and to be proved at trial.

121.   As a direct and proximate result of Defendant the CMU Board of Trustees' unlawful actions, Plaintiff has had to retain the services of an attorney and will continue to so suffer in the future.

**COUNT IV**
**Gender Discrimination in Violation of the Elliott-Larsen Civil Rights Act**
*(Against Defendant the CMU Board of Trustees)*

122.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

123.    The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented to suit under ELCRA on behalf of Defendant CMU, which are arms of the state.

124.    ELCRA does not permit gender discrimination within educational institutions.

125.    Plaintiff is a member of a protected class as a woman.

126.    Plaintiff was qualified to be a student of the Department

127.    Defendant CMU has intentionally discriminated against Plaintiff by depriving her of her rights under their own policies, intentionally manipulating processes to set her up for failure, interfering with her academic progress, and holding her to different academic standards than other comparable students.

128.    Defendant CMU would have not treated Plaintiff as discussed herein if she was not a woman.

129.    Defendant CMU acted willfully.

130.    Gender bias was a motivating factor behind Defendant CMU's commencement of disciplinary proceedings and corrective action against Plaintiff.

131.    Defendant CMU applied its policies and procedures in a manner that discriminated against Plaintiff on the basis of sex, causing her serious and unjustified damage.

132. As a direct and proximate result of Defendant's discrimination, Plaintiff has suffered emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses.

**COUNT V**
**Sex Retaliation in Violation of ELCRA**
**M.C.L. 37.2201 et seq.**
*(against Defendant CMU Board of Trustees)*

133. Plaintiff incorporates the preceding allegations as if fully restated herein.

134. The State of Michigan has waived its Eleventh Amendment sovereign immunity and consented to suit under ELCRA on behalf of Defendant CMU, which are arms of the state.

135. ELCRA does not permit gender discrimination within educational institutions.

136. Plaintiff is a woman

137. Plaintiff engaged in protected activity by opposing the discrimination she faced at school.

138. Defendant CMU were aware of Plaintiff's protected activity.

139. Defendants subjected Plaintiff to adverse educational actions in retaliation for her protected activity, including, but not limited to, depriving her of her rights under their own policies, intentionally manipulating processes to set her up for failure, and interfering with her academic progress.

21

140. But for Plaintiff's protected activity, Defendant CMU would not have taken adverse actions against her.

141. Defendants acted willfully.

142. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, delay in her degree; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation.

143. Plaintiff is entitled to exemplary damages because Defendants engaged in the above-described conduct with malice and reckless indifference to his federally protected rights.

## COUNT VI
### Breach of Contract

144. Plaintiff incorporates the preceding allegations as if fully restated herein.

145. A contractual relationship existed between Plaintiff and Defendant CMU, with legally binding promises being contained in the University's policies and procedures.

146. Those policies and procedures outline how the University must, among other things, handle academic disputes, assess its students, and investigate students

22

and how punishment is to be given to student found responsible for violations of University policy.

147. Defendants were required to follow these written policies.

148. Defendants materially breached its agreements, express and/or implied, when they punished Plaintiff and actively interfered with her academic process.

149. Defendants also misapplied their policies and procedures to discriminate against Plaintiff on the basis of gender and national origin, causing her serious and unjustified damage.

150. As a direct and proximate result of Defendants' unlawful actions, Plaintiff has suffered irreparable harm, injury, and damages, including, but not limited to, delay in receiving her degree; loss of income; loss of career opportunities and earning capacity; mental and emotional distress; humiliation and embarrassment; and loss of personal and professional reputation, and will continue to so suffer in the future. Plaintiff has also been forced to incur court costs and attorney's fees.

## COUNT VII
### Intentional Infliction of Emotional Distress
*(against individual Defendants)*

151. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

152.  Defendants' conduct, as described *supra*, was so outrageous in character, and so extreme in degree, as to beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.

153.  Defendants' conduct amounted to intentional infliction of emotional distress and caused damages to Plaintiff as described herein.

154.  Plaintiff has suffered damages and injury and will continue to suffer damages, including significant emotional distress, because of Defendants' unlawful acts set forth herein and to be proved at trial.

## COUNT VIII
### Gross Negligence
*(against individual Defendants)*

155.  Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

156.  Defendants' conduct, as described above, was "so reckless as to demonstrate a substantial lack of concern for whether an injury results… constituting gross negligence under Michigan law." MCL 691.1407(8)(a).

157.  Defendants are therefore not entitled to governmental immunity.

158.  Defendants' conduct, as described above, was a direct and proximate cause of the injuries to Plaintiff described herein.

159.  Plaintiff has suffered damages and injury and will continue to suffer damages including loss of income and earning capacity, injury to his

reputation, emotional distress, and other losses because of the Defendants' unlawful acts set forth herein and to be proved at trial.

## RELIEF REQUESTED

WHEREOF, Plaintiff, Jennifer Daniels, respectfully requests that after due proceedings are had there be judgment rendered in her favor against Defendants to include the following:

a. A declaration that the Defendants are in violation of 42 USC 1983 and Michigan's Elliot-Larsen Civil Rights Act, as well as state claims of Breach of Contract, Intentional Infliction of Emotional Distress, and Gross Negligence;

b. An order directing the Defendant to evaluate and neutralize its policies practices, and procedures in accordance with applicable law;

c. An award of all damages to which Ms. Daniels is entitled under law and at equity, including compensatory damages, an award of attorneys' fees, costs, and other expenses of this litigation;

d. Injunctive relief prohibiting any further acts of wrongdoing against her; and

d. An award of all other legal, general, and equitable relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Jennifer Daniels, by and through her attorneys, NACHTLAW, P.C., hereby demands a trial by jury of the issues in the above-captioned cause of action.

Respectfully submitted,

/s/ Fabiola A. Galguera
Fabiola A. Galguera (P84212)
NACHTLAW, P.C.
*Attorney for Plaintiff*
501 Avis Drive, Suite 3
Ann Arbor, Michigan 48108
(734) 663-7550
fgalguera@nachtlaw.com

Dated: May 27, 2026